Filed 3/24/23 P. v. Avalos CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BENJAMIN AVALOS,<br><br>Defendant and Appellant. | F082849<br><br>(Super. Ct. No. MF013980A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. David R. Zulfa, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Benjamin Avalos fired gunshots in the neighborhood outside his brother's residence and then fired at officers who attempted to arrest him. A jury convicted defendant of attempted murder of four officers and related charges. The trial court denied defendant's motion to strike his prior conviction and sentenced him to a total term of 14 years to life in prison, plus 44 years.

Defendant argues that (1) his four attempted murder convictions must be reversed because the "kill zone" instruction given was legally erroneous and not supported by sufficient evidence, (2) the trial court erred by not staying his sentence for shooting at an inhabited dwelling as required by Penal Code section 654,[1] (3) we should remand his case for resentencing in light of retroactive amendments to section 654, and (4) the evidence was insufficient to prove that his New Mexico conviction for third degree burglary was a prior serious felony conviction. The People concede the trial court erred when it instructed the jury on the kill zone theory for attempted murder but argue that the error was harmless. The People argue that the trial court did not err in failing to stay the sentence for shooting at an inhabited dwelling or in finding sufficient evidence that defendant's prior New Mexico conviction qualified as a prior serious felony conviction but concede that remand is necessary for resentencing under amended section 654.

We agree that we must remand for resentencing under amended section 654 and otherwise affirm the judgment.

## PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an amended information on December 3, 2020, charging defendant with attempted murder of a peace officer (§§ 664, subds. (a), (e), 187, subd. (a), 189; counts 1–4), assault on a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2); counts 5–8), assault with a semiautomatic

---

[1]    Undesignated statutory references are to the Penal Code.

firearm (§ 245, subd. (b); counts 9–12), discharge of a firearm at an inhabited dwelling (§ 246; count 13), negligent discharge of a firearm (§ 246.3, subd. (a); count 14), and misdemeanor obstruction of a peace officer (§ 148, subd. (a)(1); count 15). The amended information also alleged personal and intentional discharge of a firearm (§ 12022.53, subd. (c)) as to counts 1 through 8, personal use of a firearm (§ 12022.5, subd. (a)) as to counts 9 through 12, one prior "strike" conviction within the meaning of the "Three Strikes" law (currently codified at §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) as to counts 1 through 14, and a prior serious felony conviction enhancement (§ 667, subd. (a)) as to counts 1 through 14. Defendant pleaded not guilty to the charges and denied all allegations.

The jury convicted defendant on March 26, 2021, after a 23-day trial, of attempted murder of a peace officer (counts 1–4),[2] assault on a peace officer with a semiautomatic firearm (counts 5–8),[3] discharge of a firearm at an inhabited dwelling (count 13), negligent discharge of a firearm (count 14), and misdemeanor obstruction of a peace officer (count 15) and found true the allegations that defendant personally discharged a firearm. After defendant waived his right to a jury trial regarding his prior conviction, the trial court found the allegations to be true on March 30, 2021.

The trial court denied defendant's motion to strike his prior conviction and sentenced defendant on May 5, 2021, to a total term of 14 years to life in prison, plus 44 years as follows: concurrent terms of 14 years to life in prison (§§ 664, subds. (a), (e), 667, subd. (e)), plus 20 years (§ 12022.53, subd. (c)), plus five years (§ 667, subd. (a)) as to counts 1 through 4; stayed terms of 18 years to life in prison (§§ 245, subd. (d)(2),

---

[2]     The jury found not true that defendant committed these crimes with premeditation and deliberation.

[3]     The trial court instructed the jury not to reach a verdict as to counts 9 through 12 if they convicted defendant of counts 5 through 8.

3.

654) plus 20 years (§ 12022.53, subd. (c)) as to counts 5 through 8;[4] a consecutive term of 14 years, plus five years as to count 13 (§§246, subd. (a), 667, subds. (a), (e)); a stayed term of six years as to count 14 (§§ 246.3, subd. (a), 654); and one year in county jail as to count 15 (§ 148, subd. (a)). The court also ordered that defendant pay a $300 restitution fine (former § 1202.4, subd. (b)), a $300 parole revocation restitution fine (§ 1202.45), victim restitution (former § 1202.4, subd. (f)), a $30 criminal conviction assessment (Gov. Code, § 70373), and a $40 court operations assessment (§ 1465.8).

Defendant timely appealed on May 27, 2021.

**FACTS**

Commencing at approximately 7:59 p.m.[5] on June 22, 2020, dispatchers working with the Department of the California Highway Patrol (CHP) and Kern County Sheriff's Office (KCSO) received 911 calls that reported a man was shooting a gun on Leopard Court in Rosamond. CHP received the first call from Jason T., followed by a call from Adam S. Both calls were transferred to KCSO's dispatch. Jason testified that he lived in in another cul-de-sac near the house where Frankie, defendant's brother, and defendant lived. Just before an 8:00 p.m. scheduled power outage, Jason was working in his garage and heard gunshots. He described hearing additional gunshots as he walked through the neighborhood to determine the source of the shooting. Jason later observed defendant from behind a wall at the end of the cul-de-sac where defendant lived. He saw defendant in defendant's driveway sporadically firing into the air. At one point, defendant went into his residence and returned with ammunition, placed the ammunition on a white SUV in his driveway, and then loaded magazines from the hood of the vehicle. This happened more than once. Defendant fired gunshots in Jason's direction. Jason testified that

---

[4]     Counts 9 through 12 were lesser included offenses of counts 5 through 8 and, as the jury rendered no verdict as to them per the court's instructions, the trial court dismissed them.

[5]     Subsequent references to times are to times on June 22, 2020.

defendant was standing at the top of the driveway and pacing when law enforcement first started down the cul-de-sac. Officers drove part-way down the cul-de-sac and then stopped to call out commands. Jason ducked behind the wall when he saw defendant raise his arm toward the officers and then heard three gunshots. Defendant was in the middle of the cul-de-sac when Jason heard the shots.

Adam lived at the end of the cul-de-sac. Before the scheduled power outage, Adam heard eight to 10 gunshots and went outside to investigate. While standing outside with his neighbor, Adam saw defendant come from defendant's residence and fire six to eight shots into the air. Defendant went back inside his residence and fired additional shots. Adam called defendant's brother to advise what had transpired and then called 911. Adam directed his family to leave the neighborhood and took a position behind the brick wall at the end of the cul-de-sac. At some point, Adam saw officers driving down the cul-de-sac and heard three or four more gunshots, but he did not see defendant from behind the wall. Adam told Nathan Sargeant, a deputy sheriff of Kern County, that Adam heard four gunshots after the officers told defendant that defendant was under arrest.

After the scheduled power outage, Kenneth W. heard a man yelling for the power to be turned on and someone responded. Looking out of his bedroom window, Kenneth saw defendant standing in defendant's driveway holding a firearm and looking down the cul-de-sac. Defendant raised his hand and pointed the gun toward the cul-de-sac and appeared to fire it. Kenneth heard several clicks but believed that the gun did not fire. Kenneth left the window to find a phone, and when he returned, he saw defendant point the gun toward the end of the cul-de-sac and fire three shots. Kenneth then noticed the officer's lights and heard announcements on a loudspeaker. Kenneth saw defendant stand at the front end of the white SUV in the driveway, turn toward the officers, raise his

5.

arm, and fire two shots. Before testifying, Kenneth told Sargeant that he heard four gunshots after an officer had announced their presence.

Diana G. lived in the same cul-de-sac as defendant. She and her husband heard gunshots between 7:00 and 7:15 p.m., and then several more 10 to 15 minutes later. Sometime after 8:00 p.m., she looked from her front bedroom window and could hear officers on a loudspeaker. Diana saw someone in defendant's driveway crouched near the vehicle parked there. The individual stood up and fired two or three shots. Diana saw the flashes from the gun near the individual's head and pointing down the cul-de-sac toward the intersection. Diana told Sargeant that, after hearing announcements, she saw defendant turn his body toward the officers and three muzzle flashes, and she heard three shots.

Once a month, James K. visited his sister's residence, which was next door to defendant's residence. James first heard gunshots from defendant's residence at approximately 12:30 p.m. Later that day, he was outside his sister's residence as it was getting dark and saw defendant put two guns on the hood of the white SUV in defendant's driveway. Defendant appeared drunk and was mumbling to himself as he faced the street. James heard defendant say, " 'I'm going to kill something.' " James heard someone tell him to go back inside his residence and that sheriff deputies were on their way. James told Sargeant that he heard additional gunshots after officers announced their presence.

Deshan W., another of defendant's neighbors, also heard gunshots while sitting outside the front of his house. He walked toward the street to investigate and another neighbor yelled for him to go back inside because somebody was shooting a gun. While inside, Deshan could not hear any gunshots unless he was near an open window. While in the bedroom, Deshan heard officers ordering defendant to surrender his weapon and come out. Deshan heard another burst of three to five gunshots that evening. Deshan

6.

testified that he believed he heard this second burst of shots after hearing officers on the loudspeaker or while having information from some source that officers were in the area. Sargeant testified that Deshan told him that Deshan heard the officers on the loudspeaker and then heard three to four shots immediately after.

CHP Officers Bryan Lombardi and Brandon Chitty arrived first, at approximately 8:17 p.m., and parked just south of where Deboran Street meets Leopard Court. Kern County Deputy Sheriffs Nathan Sargeant and Adam Johnston arrived next in separate vehicles and joined the CHP officers while waiting for additional units. Kern County Deputy Sheriffs Kevin Giorgio, Jesse Quiapo, and Chris Strunc joined them shortly thereafter.

At approximately 8:40 p.m., the officers heard between three and five rapid gunshots fired from the area of defendant's residence at the end of the cul-de-sac. The officers decided to approach defendant's location, using two patrol vehicles with open doors as cover. Quiapo drove one of the vehicles and Sargeant drove the other. The patrol vehicles traveled next to each other down Leopard Court at a speed of three to five miles per hour. Lombardi walked between the two vehicles, within two to three feet of Quiapo. Giorgi walked on the passenger side of the northernmost vehicle with Chitty.

When the patrol vehicles were positioned approximately 100 yards from defendant's residence, and three or four houses from the corner, the officers activated some of the spotlights on the patrol vehicles. Quiapo used the loudspeaker to announce to defendant that he was under arrest and demanded that he come out with his hands raised. Quiapo saw defendant standing near a white SUV in the driveway and gave defendant additional commands after defendant yelled back at Quiapo. Immediately after Quiapo's announcements, defendant shot at the officers three or four times. Quiapo got out of the patrol vehicle and took cover behind it. Quiapo saw that defendant had a gun in his hand pointed at the officers.

7.

When Johnston arrived on scene, he positioned himself in the driveway of the first, and then the second, house from the corner and looked toward the end of Leopard Court. While the other officers were staging, Johnston heard gunshots from the end of the cul-de-sac. After Johnston heard the shots, he heard Quiapo radio that officers heard gunshots and would be contacting the subject. When Johnston saw the patrol cars driving onto Leopard Court, he ran from his position and took cover behind the northernmost vehicle. Johnston then saw two or three flashes of light from defendant's residence and someone standing there. Johnston recognized the flashes to be muzzle flashes and could tell that the barrel was pointed at the officers because of the shape of the flashes.

After hearing the gunshots while staging with the other officers, Strunc advanced down Leopard Court to the second house from the corner and took cover behind a vehicle in the driveway. He saw defendant standing in the driveway of defendant's residence and facing the white SUV located in front of the garage. Strunc was still positioned in the driveway when he saw the patrol vehicles make their way down Leopard Court and heard Quiapo's announcements on the loudspeaker. Approximately five seconds after the announcements, Strunc saw defendant had something in his hand that appeared to be a firearm. Defendant raised his arm from pointing downward until parallel to the ground, rotated his body toward Strunc and the other officers, and fired. Strunc saw three muzzle flashes and heard three gunshots. The muzzle flashes appeared as full circles and indicated that the gun was pointed at him. After the first shot was fired at Strunc, defendant shifted slightly and fired toward the other officers.

Chitty testified that he initially saw defendant hunched over the front of the white SUV. Defendant had something in his hand that resembled a firearm based on its color and the manner defendant held it. Defendant faced the officers with his hand extended. After Quiapo's announcement, defendant fired several shots at them. Chitty reported to

8.

CHP's dispatch that officers were taking fire. Chitty took cover behind the patrol car and waited for the volley of shots to stop.

Sargeant testified that defendant was yelling incoherently from the front of the white SUV when Sargeant first saw him. After Quiapo announced their presence and ordered defendant to come out, Sargeant heard four gunshots and saw four muzzle flashes around defendant's head and pointed toward them. He could tell that the firearm was pointed toward him because the muzzle flashes were circular. The position of the muzzle flashes was consistent with someone holding a firearm at shoulder level and looking down the site of the firearm to aim as they fired the shots. Sargeant threw the patrol vehicle into park, jumped out, and gained cover behind the driver's side door.

Lombardi testified that he saw defendant standing in defendant's driveway near the white SUV through the sites of his rifle. Lombardi saw the muzzle flashes coming from defendant and heard the whizzing sound of three or four bullets pass over his head. He could tell that the firearm was pointed at him because the muzzle flashes were round. Lombardi took cover behind the back of Quiapo's patrol vehicle.

Giorgi testified that the patrol vehicles initially drove down Leopard Court without lights. Giorgi used the magnifying scope on his rifle to see defendant in the driveway and announced this to the other officers. Quiapo and Sargeant stop their patrol vehicles stopped and turned on their spotlights. Quiapo then started making announcements over the loudspeaker. Defendant grabbed something from the hood of the SUV and walked toward the driver's side of the SUV. As defendant was walking toward the rear door on the driver's side of the SUV, he raised his arm, pointed it at the officers, and fired three or four shots. Giorgi heard the gunshots and saw the muzzle flashes through the rifle scope. The shapes of the muzzle flashes were circular and indicated the gunshots were fired in his direction. After ducking down, Giorgi saw defendant walk back to the hood

9.

of the SUV and thought defendant was reloading the firearm. Giorgi announced this information to the other officers over the radio.

At approximately the same time as Chitty reported that the officers were under fire, Lisa M. was on the phone with CHP's dispatch and then transferred to KCSO's dispatch.[6] Lisa lived at a residence one street behind defendant's residence and was outside with her family after the scheduled power outage. Lisa heard three gunshots and the sounds of bullets ricocheting. While on the phone with 911, Lisa heard "about four" additional gunshots and ran into her house. At the time of hearing the last shots, Lisa was aware that officers were driving down Leopard Court and heard the announcements officers made on the loudspeaker.

Robert L. lived on a street separated from defendant's neighborhood by a field. After it started to get dark, Robert, his sons, and his nephew took their dog for a walk. Robert noticed law enforcement vehicles parked across the field on Deboran Street. He heard three gunshots in rapid succession and then bullets whiz past his head. He felt a breeze from one of the bullets. Robert called 911 when he returned to his house.

After defendant fired those shots, Quiapo moved to the passenger side of his patrol vehicle and gave additional commands over the loudspeaker. Lombardi drove one vehicle and Johnston drove the other as both patrol vehicles started to move forward. Defendant walked down the driveway with his hands in the air, then moved his hands to his waist, put his hands in his pocket, and yelled to the officers to shoot him. Defendant did not have anything in his hands and appeared to have left his gun on the hood of the SUV. Once the officers were within 15 to 20 yards of defendant and he failed to comply with their orders, Strunc deployed a taser and defendant was taken into custody.

---

[6]     Dispatch records reflect an incorrect last name for Lisa, but she identified her voice on the 911 recording, and the recording confirms that the dispatch operator recorded her name incorrectly.

10.

Strunc transported defendant to the hospital so that the taser probes could be removed. While in route, defendant asked Strunc if he believed in God, commented about a new world order, and claimed that he was immortal and the officers would not have been able to kill him. While awaiting discharge paperwork, defendant appeared agitated. He told Strunc loudly and angrily, " 'If I see you motherfuckers again, I'm going to shoot every one of you.' "

Officers saw a handgun, magazines, and ammunition on the hood of the SUV. Sargeant saw shell casings in the driveway, entryway, and on the front yard. Officers seized 24 spent shell casings outside defendant's residence; several were within three to five feet of where the officers had seen the muzzle flashes when defendant shot at them. Officers saw bullet holes in the kitchen, living room, and primary bedroom, and they seized 18 spent cartridges from inside the residence. Officers did not find any bullet holes or damage to any other residences.

## DISCUSSION

**I.     The trial court erred in instructing the jury that it could convict defendant of attempted murder based upon the kill zone theory, but such error is harmless.**

### A.     Background

The trial court instructed the jury, pursuant to CALCRIM No. 600, that for the crime of attempted murder, "the People must prove, one, the Defendant took at least one direct but ineffective step toward killing another person; and two, the Defendant intended to kill that person." The trial court's definition of "direct step," included that "[a] direct step indicates a definite and unambiguous intent to kill."

In addition, the trial court instructed the jury with a modified version of the bracketed section of CALCRIM No. 600, to be included when the kill zone theory applies:

11.

"A person may intend to kill a primary target and also secondary targets with[in] any [*sic*] zone of fatal harm or kill zone. A kill zone is an area in which the Defendant used lethal force that was designed and intended to kill everyone in the area around the primary target. In order to convict the Defendant of the attempted murder of … Lombardi, Count 1; … Quiapo, Count 2; … S[a]rgeant Count 3; and … Strunc, Count 4, the People must prove the Defendant not only intended to kill[7] but also intended to kill … Lombardi; … Quiapo; … S[a]rgeant; … Strunc; or intended to kill everyone within the kill zone.

"In determining whether the Defendant intended to kill … Lombardi; … Quiapo; … S[a]rgeant; and … Strunc, the People must prove, one, the only reasonable conclusions from the defendant's use of lethal force is if the Defendant intended to create a kill zone; and two, … Lombardi[;] … Quiapo; and … S[a]rgeant; and … Strunc were located within the kill zone. In determining whether the Defendant intended to create a kill zone and the scope of such a zone, you should consider all of the circumstances including but not limited to the following: The type of weapon used, the number of shots fired, the distance between the Defendant and [Lombardi]; … Quiapo; … S[a]rgeant [;]and … Strunc. The distance between … Lombardi, … Quiapo, … S[a]rgeant, and … Strunc and the primary target.

"If you have a reasonable doubt whether the Defendant intended to kill … Lombardi, … Quiapo, … S[a]rgeant, and … Strunc or intended to kill[8] by killing everyone in the kill zone, then you must find the Defendant not guilty of the attempted murder of … Lombardi, … Quiapo, … S[a]rgeant, and … Strunc."

During closing argument, the prosecutor reviewed the circumstantial evidence that proved defendant intended to kill the victims. She noted that shooting a gun at another human being was powerful evidence of an intent to kill. The prosecutor argued that a firearm is a deadly weapon and, even if defendant did not know the name of his victims,

---

**7** CALCRIM No. 600 requires that the name of primary target be supplied here: "[T]he People must prove that the defendant not only intended to kill *<insert name of primary target alleged>* …." (CALCRIM No. 600, boldface and underlining omitted.)

**8** CALCRIM No. 600 requires that the name of primary target be supplied here: "[O]r intended to kill *<insert name or description of primary target alleged>* by killing everyone in the kill zone …." (CALCRIM No. 600, boldface and underlining omitted.)

he would be guilty if he knew the victims were there and intended to kill them. She also emphasized that defendant fired three or four rounds, which required him to pull the trigger each time and make "a conscious decision to fire a bullet at those officers."

The prosecutor argued that "[k]illing had been on [his] mind all day," as evidenced by testimony that defendant had fired multiple rounds throughout the day. Defendant also said, "I'm going to kill something," when he slammed two firearms onto the hood of the white SUV just before law enforcement arrived. The prosecutor argued that defendant's intent developed throughout the incident as reflected by defendant's statement to Strunc after the incident and while at the hospital: " 'If I see you motherfuckers again, I'm going to shoot every one of you.' "

After reviewing this evidence, the prosecutor argued, "There are two ways to get to attempted murder in this case":

"First, the Defendant intended to kill … S[a]rgeant, … Lombardi, … Quiapo or … Strunc. The other way is what we call the kill zone theory.… [E]ssentially, the Defendant intended to kill everyone in that zone, that kill zone, in order to kill these deputies. So he was firing multiple rounds in order to kill all of the officers that were approaching with the intent that these officers end up dead. Okay?

"The factors to consider in determining whether the Defendant intended to create a kill zone and the scope of the kill zone is the type of weapon he used that was [a] semi-automatic firearm; so he's shooting multiple rounds. The numbers of shots fired. He didn't just shoot. He didn't just aim at one person and shoot at one person. He shot multiple rounds into the deputies that were approaching, the distance between the primary targets and the secondary targets. So the distance between all of the officers you will notice when you look at the videos and the photos. And in this case like that, all of the officers are standing within the scope of the road. I mean … Strunc was on … the driveway. But between … Strunc and … Giorgio the roadway was the distance that he was firing at.

"You will also remember that … Strunc recalls that the Defendant kind of moved his body or his arm a little bit as he was going to shoot the various rounds. He started shooting at … Strunc, and he turned his body just slightly and fired those multiple rounds toward officers. That is

13.

corroborated with what we know from [Robert] on the other side of Myrtle. He didn't feel all three bullets. He heard all three of them. But there was some distance between the bullets because one of them … was close enough for him to feel, and the others were close enough for him to hear but not feel, which suggests there was a slight difference in where those gunshots were aimed at.

"The kill zone theory for attempted murder in this case—because he is guilty, according to both, either just straight intent to kill those officers, and also his intent to kill all of the officers in this case—the kill zone factors here are also supported by the Defendant's own statement.… [W]hen he states that he's going to shoot each of you, he's referring to multiple officers. He's not saying I'm going to shoot you, … Strunc alone, I'm going to shoot each of you."

## B. Standard of Review and Applicable Law

### 1. Standard of Review[9]

We independently review the record to determine whether substantial evidence supports a jury instruction. (See *People v. Kerley* (2018) 23 Cal.App.5th 513, 565.) If the record does not support the instruction, we must reverse the conviction on which the instruction is based unless the error was nonprejudicial. (See *People v. Canizales* (2019) 7 Cal.5th 591, 612–613 (*Canizales*).) Different standards of prejudice apply to different instructional errors. (*Id*. at p. 613, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1128 (*Guiton*).) For factually unsupported but legally sound instructions, we may reverse only when the record "affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Guiton*, at p. 1130.) For legally inadequate instructions, we may reverse only if there is a reasonable likelihood

---

**9** While the discussion about jury instructions was not reported, the court invited the parties to state any objections for the record, and defense counsel did not object to the instruction for attempted murder. Nonetheless, we review the instructional error on the merits because it is not forfeited if it affects defendant's substantial rights. (§ 1259; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

14.

that the jury understood and applied the instruction in a legally impermissible manner. (*Canizales*, at p. 614.)

### 2. Governing Law

Attempted murder requires the specific intent to kill the victim(s) " 'and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine. [Citation.] [¶] Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Canizales*, *supra*, 7 Cal.5th at p. 602.)

Our Supreme Court has recognized two scenarios in which a defendant concurrently intends to kill multiple victims. (See *People v. Stone* (2009) 46 Cal.4th 131, 141 (*Stone*); *People v. Bland* (2002) 28 Cal.4th 313, 329 (*Bland*).) One scenario of concurrent intent exists when a defendant indiscriminately fires into a group of people with the intent to kill "a random person rather than a specific one." (*Stone*, at p. 141 [a primary target is not required under this scenario].) Under this theory, it can be found the defendant intended to kill "anyone who got in the way of his bullets." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 396 (*Thompkins*).)

Under the second scenario, a defendant intends primarily to kill a specific victim while concurrently intending to kill others within a zone of fatal harm or "kill zone." (*Canizales*, *supra*, 7 Cal.5th at p. 603; *Bland*, *supra*, 28 Cal.4th at p. 329.) "In *Bland*, *supra*, 28 Cal.4th 313, this court expressly embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder. Under that theory, … the nature and scope of the attack directed at a primary

15.

victim may raise an inference that the defendant ' "intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." ' " (*Canizales*, at p. 602.) "[W]e explained that ' "[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." ' " (*Canizales*, *supra*, 7 Cal.5th at pp. 602–603, first bracketed insertion added.)

"*Bland* applied what is now commonly referred to as the "kill zone" theory to uphold the attempted murder convictions in that case. The record there showed that the defendant and a fellow gang member approached a car in which a rival gang member was sitting in the driver's seat and opened fire with a .38-caliber handgun, shooting numerous rounds both into the vehicle and at the vehicle as it drove away. The driver was killed and his two passengers, who were not gang members, were wounded. [Citation.] We concluded that the evidence 'virtually compelled' a finding that even if the defendant primarily intended to kill the rival gang member, he also, concurrently, intended to kill the passengers in the car, or, at the least, intended to create a zone of fatal harm. [Citation.]

"*Bland*'s adoption of the kill zone theory meant that a prosecutor charging attempted murder in a multivictim case had an additional, alternative ground by which to prove the requisite intent to kill. Under appropriate facts, the prosecutor could attempt to show either that the defendant's intent to kill one or more alleged victims arose independently of his actions toward any other victim, or that the defendant's intent to kill an untargeted victim arose concurrently with his intent to kill a primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 603.)

"The kill zone theory looks to circumstantial evidence to support a permissive inference regarding a defendant's intent. This is not unusual. As we have described on many occasions, intent to kill often must be inferred from circumstantial evidence

16.

surrounding the crime. [Citation.] And when the prosecution's theory substantially relies on circumstantial evidence, a jury must be instructed that it cannot find guilt based on circumstantial evidence when that evidence supports a reasonable conclusion that the defendant is not guilty." (*Canizales*, *supra*, 7 Cal.5th at p. 606.)

"We therefore conclude that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

"We accordingly take this opportunity to reiterate that the kill zone instruction is not appropriate in the absence of evidence indicating the defendant had a primary target, and the specific intent to kill everyone in the kill zone around the primary target to ensure the target's death. The theory does not mean the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given." (*People v. Medina* (2019) 33 Cal.App.5th 146, 156, holding modified by *Canizales*, *supra*, 7 Cal.5th 591.)

17.

### C.	Analysis

#### 1.	*Use of Kill Zone Instruction in This Case*

Our Supreme Court "emphasize[d] that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) "Trial courts … should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Ibid*.)

In this case, defendant argues, and the People concede, that the evidence did not disclose a primary target nor did the prosecutor argue that defendant intended to kill a specific officer. However, "[w]hen the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, … evidence of a primary target is required." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) *Canizales* cited with approval *People v. Medina*, *supra*, 33 Cal.App.5th 146, review dismissed September 11, 2019, S255373, which explained: "A kill zone instruction is never required, and as numerous appellate cases attest, giving such an instruction can often lead to error. For example, a kill zone instruction is not appropriate where a defendant fires a deadly weapon into a group of individuals with the intent to kill but without a primary target. Nor, in the absence of a primary target, is a kill zone instruction appropriate even if the defendant intends to kill everyone in that group. Where there is no primary target, there is no concurrent intent and no basis for a kill zone instruction. It is further important to understand that while a kill zone instruction would not be appropriate, a defendant could still be convicted of attempted murder under these circumstances. A jury can reasonably conclude a defendant without a primary target who repeatedly shoots into a crowd with

18.

the intent to kill committed multiple counts of attempted murder." (*Id.* at p. 156, citing *Stone*, *supra*, 46 Cal.4th at pp. 138–140.)

Defendant also argues, again with the concession of the People, that the kill zone was not a proper theory of guilt based on the evidence here because defendant did not create the zone of fatal harm required in *Canizales*. (See *Canizales*, *supra*, 7 Cal.5th at p. 611.) In *Canizales*, the evidence showed that the shooter fired five bullets, from around 100 feet away on a wide city street, and the bullets were " 'going everywhere' " but did not hit anyone. (*Ibid.*) The Supreme Court concluded "that the evidence concerning the circumstances of the attack (including the type and extent of force used by [the shooter]) was not sufficient to support a reasonable inference that [the] defendants intended to create a zone of fatal harm around a primary target." (*Id.* at p. 610.) An instruction on the kill zone theory of liability was therefore unwarranted. (*Id.* at p. 611.) The shooting here, like the one in *Canizales*, was in an open area, the handgun here was not consistent with the high-powered weapons typically employed in kill zone cases, only three to four shots were fired, and defendant was approximately 100 yards, or 300 feet, from the officers.

We agree with defendant's argument that the trial court erred in instructing the jury as to the kill zone theory in the absence of a primary target and the facts are not sufficient to show that defendant created a zone of fatal harm. We accept the People's concession that the instruction was error.

### 2. *Harmless Error*

The question remains whether this error requires reversal of the four counts of attempted murder. To the extent the court erred in instructing on a theory unsupported by the evidence, the error is one of state law, and "reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton*, *supra*, 4 Cal.4th at p. 1130 [applying harmless error under *People v.*

19.

*Watson* (1956) 46 Cal.2d 818, 836].)  On the other hand, "[i]nstructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201, superseded by statute as stated in *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–249; *People v. Aledamat* (2019) 8 Cal.5th 1, 13 [alternative-theory error is subject to the more general harmless error test in *Chapman v. California* (1967) 386 U.S. 18, 24].)  The reviewing court must examine the entire cause, including the evidence, and consider all relevant circumstances when determining whether the error was harmless beyond a reasonable doubt. (*Aledamat*, at p. 13.)

Defendant argues the instructional error should be subject to the harmless beyond a reasonable doubt standard of *Chapman*, contending the CALCRIM No. 600 instruction given to the jury did not accurately explain the kill zone theory.  Defendant asserts this instruction did not require the jury to find intent to kill the primary target, thereby allowing the attempted murder convictions to be based solely on a finding of implied malice—in other words, that the jury could erroneously find intent if it concluded the reckless firing of a gun created the possibility officers would be harmed.

We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  " 'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions as a whole, not in isolation.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 544.)  The test is " 'whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of the trial, and the arguments of counsel.' " (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)  As explained above, proof of express malice is required to establish attempted murder.  That is, the defendant must have intended to cause the death of the victim or have known to a substantial certainty that death would

20.

occur. Implied malice or conscious disregard for human life will not suffice. (*People v. Smith* (2005) 37 Cal.4th 733, 739; *Bland*, *supra*, 28 Cal.4th at pp. 327−328.)

In accordance with CALCRIM No. 600, the instruction in this case advised the jury that they needed to find that defendant intended to kill each victim. The instruction then stated, "A person may intend to kill a primary target and also secondary targets with[in] any [*sic*] zone of fatal harm or kill zone. A kill zone is an area in which the Defendant used lethal force that was designed and intended to kill everyone in the area around the primary target." The instruction then listed each charge and named Lombardi, Quiapo, Sargeant, and Strunc as the victims of attempted murder in each count, respectively. When describing the kill zone theory, however, the instruction failed to name a primary target and provided, "[T]he People must prove the Defendant not only intended to kill, [(failing to insert the name of a primary target)] but also intended to kill … Lombardi; … Quiapo; … S[a]rgeant; and … Strunc; or intended to kill everyone within the kill zone." The instruction correctly provided that the jury must find the only reasonable conclusion from defendant's lethal use of force was that he intended to create a kill zone and that the victims must have been within it. It described the circumstances to be considered, including "the distance between [each victim] and the primary target." The instruction concluded, "If you have a reasonable doubt whether the Defendant intended to kill [Lombardi, Quiapo, Sargeant], and [Strunc] or intended to kill [(failed to insert the name of a primary target)] by killing everyone in the kill zone, then you must find the Defendant not guilty of the attempted murder of [each victim]."

The jury instruction in this case introduced the concept of kill zone by referring to the defendant's intent to kill a primary target and secondary targets in the kill zone, and then defined "kill zone" as an area where defendant used lethal force "designed and intended to kill everyone in the area around the primary target." The instruction clearly identified that use of the kill zone theory required that the jury find defendant had a

21.

primary target. We find that the failure to identify the primary target in the instruction would not mislead the jury into applying the theory where the evidence failed to disclose a primary target and, therefore, did render the instruction legally inadequate for that reason.

The question, then, is whether the jury instruction broadened the definition of the kill zone theory and reduced the requisite intent to kill everyone within the zone of harm to a mere conscious risk of serious injury or death. (See *Canizales*, *supra*, 7 Cal.5th at p. 614.) We are not persuaded that the instruction permitted the jury to convict without finding an intent to kill the four officers. The instruction clearly set forth the requirement that there be a primary target for application of the theory. The instruction's failure to identify the primary target would have caused the jury to either conclude that the instruction was not applicable or that it needed to find that defendant shot at the officers with intent to kill everyone hit by his bullets. The latter conclusion is consistent with the scenario of concurrent intent that exists when a defendant indiscriminately fires into a group of people with the intent to kill "a random person rather than a specific one." (*Stone*, *supra*, 46 Cal.4th at p. 141; see also *id*. at p. 140 [a primary target is "not required" under such scenario].) Under this theory, it can be found the defendant intended to kill "anyone who got in the way of his bullets." (*Thompkins*, *supra*, 50 Cal.App.5th at p. 396.) The kill zone theory looks to circumstantial evidence to support a permissive inference regarding a defendant's intent. (*Canizales*, *supra*, 7 Cal.5th at p. 606.) However, the language of the instruction in this case specifically stated that the jury had to find that defendant intended to kill each victim or intended to kill anyone hit by his bullets. Defendant relies upon *Thompkins* to support his argument that use of the instruction here was prejudicial. But in *Thompkins*, unlike here, the court found that the instruction was legally insufficient by permitting kill zone application where the circumstances permit "reasonable inference" that the defendant intended to kill

22.

rather than the "only reasonable inference." (*Thompkins*, *supra*, 50 Cal.App5th at p. 399.)

Our Supreme Court determined in *Canizales* that the errors there were the presentation of a factually unsupported theory and the instruction was legally inadequate because it failed to provide any definition of "kill zone." (*Canizales*, *supra*, 7 Cal.5th at p. 613.) Additionally, the prosecutor "substantially aggravated the potential for confusion" when it described the kill zone as an area where people "can get killed" (*id.* at p. 613) and equated the kill zone with conscious disregard for life or implied malice (*id.* at p. 614). Unlike *Canizales*, the instruction here defined the kill zone and neither the instruction nor the parties' arguments "had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory." (*Ibid.*)

There was no instructional error requiring that we apply *Chapman* review, and we instead assess pursuant to *People v. Watson*, *supra*, 46 Cal.2d at page 836, whether it is reasonably probable the jury would have reached a result more favorable to defendant had the kill zone instruction not been given or whether the record affirmatively demonstrates a reasonable probability that the jury found defendant guilty based solely on the kill zone theory. (See *Guiton*, *supra*, 4 Cal.4th at p. 1130.)

We agree with the People and conclude that a different result was not reasonably probable in this case. To begin, the jury was instructed to disregard any instructions that did not, on their own terms, apply to the facts as the jury found them. Because the kill zone instruction was premised on a finding that defendant had one or more "primary target[s]," the jury may well have disregarded the kill zone instruction given the absence of any evidence of such targets. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 152–153 [court could not assume that the jurors failed to follow the standard admonition to disregard any instruction inapplicable to the facts as they found them]; *People v. Von*

23.

*Villas* (1992) 11 Cal.App.4th 175, 238 [instruction telling jury to disregard inapplicable instructions counsels against a finding of prejudice].)

The facts in this case do not present a scenario in which an intent to kill one victim was clearer than an intent to kill another, so the jury would not have been able to identify a primary target. The evidence overwhelmingly established that defendant indiscriminately shot at the officers approaching to arrest him. (See *Thompkins*, *supra*, 50 Cal.App.5th at p. 396; *Stone*, *supra*, 46 Cal.4th at p. 141.) Defendant fired at the closely congregated officers (some separated by one or two feet) starting with Strunc, who stood in a residential driveway, and then shifted his aim to the other officers in the street across from Strunc. (Cf. *People v. Cardenas* (2020) 53 Cal.App.5th 102, 116 [finding prejudice where evidence supported reasonable inference that shooter did not intend to kill those who were not in line of gunfire because shooter fired directly at one victim from close range and continued firing toward that specific victim].) Nothing in the ballistics evidence here suggests defendant had a primary target.

Further, nothing in the instruction or closing argument suggested that the jury could convict defendant if he simply created a zone in which the victims *could* be killed. (See *Canizales*, *supra*, 7 Cal.5th at pp. 613–614 [improper argument to the jury that " 'people are within the zone that they can get killed' " was "significantly broader than a proper understanding of the theory permits"].) Rather, the relevant jury instruction confirmed the necessity to find that defendant intended every person be killed before concluding that defendant created a kill zone, and the omission of the primary target's name narrowed the jury's focus to determining whether defendant intended to kill each of the named victims or all of the officers attempting to arrest him. The prosecutor's closing remarks did nothing to broaden the mental state required, and actually reinforced the jury's understanding that it needed to conclude that defendant fired gunshots to kill everyone in that zone: "[E]ssentially, the Defendant intended to kill everyone in that

24.

zone, that kill zone, in order to kill these deputies. So he was firing multiple rounds in order to kill all of the officers that were approaching with the intent that these officers end up dead."

The trial court instructed the jury on attempted murder, including the elements that defendant took a direct step toward killing another person and "[d]efendant intended to kill that person." The court further instructed the jury that convicting defendant of attempted murder of each victim required finding an intent to kill each victim, or an intent to kill everyone within the kill zone. The People argued in closing that defendant intended to kill each victim. The defense argued lack of intent and that the evidence failed to demonstrate that defendant fired in the direction of the officers. Considering the instructions given, the entire record of the trial, and the arguments of counsel, we do not find any reasonable likelihood the jury misconstrued or misapplied the law on express malice.

In evaluating what the jury is likely to have done in the absence of the kill zone instruction, we "may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) The evidence in this case established that defendant had been firing a gun in his neighborhood for several hours before law enforcement was called. James testified that shortly before the officers arrived, defendant stood in front of his vehicle, loaded ammunition into his gun on the hood of the vehicle, and mumbled that he intended to "kill something." The officers arrived, drove toward defendant's residence, stopped, used spotlights, and announced their identity and that defendant was under arrest. Immediately after the announcement, several witnesses saw defendant turn toward the officers, point his firearm, and shoot three to four times. Strunc testified that defendant

25.

initially shifted toward his location and fired a shot before turning the gun on the other officers. Robert corroborated the officers' testimony by testifying that bullets whizzed by his head while he walked across the field, approximately 1,934 feet (or one-third of a mile) away and in line with Leopard Court. Finally, defendant told Strunc after the incident that he intended to the shoot the officers if he saw them again.

Given evidence that defendant specifically aimed and fired at the approaching officers, the number of shots fired, the proximity and direction of the gunfire, and the People's non-kill zone argument for guilt, the error in giving the kill zone instruction was harmless. Here, it is not reasonably probable the jury would have reached a result more favorable to defendant in the absence of the kill zone instruction as uncontradicted testimony of the officers, supported by video recordings and defendant's statements before and after the shooting, provided relatively strong evidence of specific intent to kill the officers, and any evidence supporting a different outcome was relatively weak.

## II. The trial court did not err in failing to stay defendant's sentence for shooting at an inhabited dwelling pursuant to section 654.

### A. Background

The probation report recommended that the trial court sentence defendant to a term of 7 years, doubled pursuant to section 667, subdivision (e), plus five years pursuant to section 667, subdivision (a), to be served consecutively to counts 1 through 4 "as it appears to have been a separate act based on information at hand." Defendant did not object to this recommendation and the trial court followed the recommendation without comment.

### B. Standard of Review and Applicable Law

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.) Where

the trial court makes no express section 654 findings, we consider whether substantial evidence supports an implied finding. (See *DeVaughn*, at p. 1113; *People v. Islas* (2012) 210 Cal.App.4th 116, 129.) " ' "We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*DeVaughn*, at p. 1113.)

The trial court must enter a stay rather than impose a concurrent sentence if section 654 prohibits multiple punishments. (*People v. Jones* (2012) 54 Cal.4th 350, 353.) Section 654 generally precludes punishment for multiple crimes arising from a single course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) The purpose of the provision is to ensure a defendant's punishment is commensurate with his or her culpability. (*Id.* at p. 1211.) Whether a course of conduct is divisible and therefore subject to multiple punishment depends on the intent and objective of the actor. (*People v. McFarland* (1962) 58 Cal.2d 748, 760.)

### C.     Analysis

Defendant argues that his conviction for shooting at an occupied dwelling could only have been based upon the four shots he fired toward the peace officers that were the basis of his attempted murder convictions (counts 1 through 4). He argues, therefore, that the trial court erred in failing to stay the sentence on count 13 because it was based upon the same single act of shooting at the officers. The People respond that defendant engaged in multiple shootings prior to his final shots at the officers and that these separate acts justify the additional sentence.

We need not delve into divisibility or defendant's intent and objective because section 654 does not apply to crimes of violence against multiple victims. (*People v. Oates* (2004) 32 Cal.4th 1048, 1063, superseded by statute on other grounds as stated in *People v. Tirado* (2022) 12 Cal.5th 688, 696; *People v. King* (1993) 5 Cal.4th 59, 78). " ' "[W]hen a defendant ' "commits an act of violence with the intent to harm more than

27.

one person or by means likely to cause harm to several persons," his greater culpability precludes application of section 654.' " ' " (*People v. Centers* (1999) 73 Cal.App.4th 84, 99.)

In this case, when defendant fired at the officers, he first directed his firearm at Strunc, who was standing in the driveway of one residence, and then toward the other officers in the street at an angle that could have resulted in hitting any house beyond the officers. Lisa testified that defendant lived one street in front of her and, while on the phone with 911, she reported that she heard gunshots and believed bullets had reached her backyard as she was on the phone. Additionally, Robert testified that he was walking in his front of his neighbor's house (approximately one-third mile away) and heard bullets whiz past his head. Therefore, defendant shot at a minimum of two other victims in addition to the officers.

"[S]ection 246 is violated when a defendant intentionally discharges a firearm either directly at a proscribed target (e.g., an inhabited dwelling house or occupied building) or in close proximity to the target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it. No specific intent to strike the target, kill or injure persons, or achieve any other result beyond shooting at or in the general vicinity or range of the target is required." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1361.) Shooting into an occupied building is a violent crime likely to cause serious injury. (See *People v. Anderson* (1990) 221 Cal.App.3d 331, 338.) The offense is fundamentally directed at all victims exposed to harm. (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1630.) The defendant need not be aware of the identity or number of people in the building to be punished separately for shooting into the building. (*Id*. at p. 1631.) Thus, it is well established that section 654 does not apply to shooting at an occupied building or inhabited dwelling when the offense involves one or more additional victims beyond the

attempted murder or assault victim. (See *Anderson*, at p. 339; see, e.g., *Felix*, at p. 1630.) That is the case here, defendant put other occupants of the homes in his neighborhood at grave risk of harm by firing multiple times during the evening, either into the air or at the officers.

The trial court did not err in declining to enter a stay on count 13 because the attempted murders and shooting at an occupied dwelling were perpetrated against different victims.

**III.** **Remand is necessary for resentencing in accordance with section 654, as amended by Assembly Bill No. 518.**

Defendant argues that his case must be remanded for resentencing on counts 1 through 8 so that the trial court may exercise its discretion under recently amended section 654. Defendant contends that because his case is not yet final on appeal, he is entitled to the benefit of section 654, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada* (1965) 63 Cal.2d 740. The People agree that we should remand the matter for resentencing and permit the trial court to reconsider its sentencing choices under the recent amendment. We accept the People's concession.

At the time of defendant's sentencing, former section 654, subdivision (a) required the trial court to punish defendant in accordance with the provision that provided for the longest potential term of imprisonment. (Stats. 1997, ch. 410, § 1, p. 2753.) The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) amended section 654 to provide the trial court with the discretion to choose the count for which it will impose punishment. (Stats. 2021, ch. 441, § 1.)

29.

Here, the trial court sentenced defendant on counts 1 through 4 (providing for the longest term of punishment) and stayed counts 5 through 8 and 14. The amendment of section 654 effected an ameliorative change to the law as trial courts are no longer required to impose sentence under the provision that provides for the longest term of imprisonment when a defendant is convicted of multiple crimes for a single act or omission. Thus, as the parties agree, defendant is entitled to the retroactive application of amended section 654 because there is no indication that the Legislature intended the law to apply prospectively only, and this case is not yet final on appeal. (See, e.g., *People v. Mendoza* (2022) 74 Cal.App.5th 843, 861–862; *People v. Sek* (2022) 74 Cal.App.5th 657, 673–674; *People v. Mani* (2022) 74 Cal.App.5th 343, 379–380.)

We will therefore remand the matter for resentencing under section 654, as amended by Assembly Bill 518.

**IV.   The evidence was sufficient to support the trial court's finding that defendant's New Mexico burglary conviction is a prior serious felony under California law.**

**A.   Background**

Defendant waived his right to a jury trial on his prior conviction allegations and the court tried the matter on March 30, 2021. The prosecutor introduced three exhibits: (1) defendant's booking record for the instant offenses; (2) a printout from the Department of Justice computer system, known as the California Law Enforcement Telecommunications System (CLETS), that reported defendant's criminal history information; and (3) certified conviction records from the New Mexico Third Judicial District Court.

The conviction records from New Mexico include an indictment (the indictment), filed on August 20, 2015, that charged defendant with "**Aggravated Burglary (Commits Battery)**" and alleged that defendant "enter[ed] the dwelling house of [Victims 1 and 2 and their address], without authorization or permission, with intent to commit criminal

30.

sexual penetration when he got inside, and touched or applied force to [Victim 2] in a rude or angry manner while entering, leaving or while inside, a second degree felony, contrary to [New Mexico Statutes Annotated (1978) section ]30-16-04[, subdivision ](C)."

On December 1, 2016, defendant pleaded no contest to residential burglary as an agreed disposition. Defendant signed a "Repeat Offender Plea and Disposition Agreement" (boldface & some capitalization omitted) (the agreement) wherein he agreed to plead no contest to "**Residential Burglary**," "a third degree felony, contrary to [New Mexico Statutes Annotated (1978) section ]30-16-03[, subdivision ](A)," "occurring on or about August 09, 2015, as charged as an included offense in Count 1 of the … Indictment." The agreement further provided that "this agreement, unless rejected or withdrawn, serves to amend the complaint, indictment, or information to charge the offense to which defendant pleads, without the filing of any additional pleading."

The trial court found defendant had been convicted of third degree burglary in New Mexico, and that this conviction qualified as both a strike offense (§ 667, subds. (e)) and a prior serious felony conviction (§ 667, subd. (a)) that could be used to enhance his sentence.

B.    Standard of Review and Applicable Law

Defendant contends that there was insufficient evidence to sustain the sentence enhancements under section 667. We disagree.

An out-of-state or foreign conviction may be found to be a strike offense in California if the conviction "is for an offense that includes all of the elements of a particular felony as defined in subdivision (c) of [s]ection 667.5 or serious felony as defined in subdivision (c) of [s]ection 1192.7." (§ 667, subd. (d)(2); see also § 1170.12, subd. (b)(2).) Thus, "[a] defendant whose prior conviction was suffered in another jurisdiction is … subject to the same punishment as a person previously convicted of an

31.

offense involving the same conduct in California." (*People v. Myers* (1993) 5 Cal.4th 1193, 1201.) Residential burglary is a serious felony under California law. (§§ 1192.7, subd. (c)(18), 460, subd. (a).) If a defendant's prior residential burglary conviction in another state qualifies as a strike, he or she is subject to a doubled term for his or her current offense (§§667, subd. (e), 1170.12, subd. (c)(1)) and a five-year additional term (§ 667, subd. (a)).

"To qualify as a serious felony, a conviction from another jurisdiction must involve conduct that would qualify as a serious felony in California." (*People v. Avery* (2002) 27 Cal.4th 49, 53.) To determine whether a prior conviction from another state contains all the elements of the California felony, the trier of fact may not look outside the record of conviction. The court may consider any evidence in the record of conviction "if not precluded by the rules of evidence or other statutory limitation." (*People v. Myers*, *supra*, 5 Cal.4th at p. 1201.) If the record does not disclose any of the facts of the offense committed, the court will presume the prior conviction was for the least offense punishable under the law of that jurisdiction. (*Myers*, at p. 1200.)

" '[I]n determining the truth of an alleged prior conviction when … the necessary elements of that conviction do not establish that it is a serious felony, and thus subject to California's Three Strikes law, the trier of fact must decide whether the defendant's conduct, as demonstrated in the record of the prior conviction, shows that the crime was a serious felony.' " (*People v. Gallardo* (2017) 4 Cal.5th 120, 135 (*Gallardo*).) In that regard, "[t]he trial court's role is limited to determining the facts that were necessarily found in the course of entering the conviction. To do more is to engage in 'judicial factfinding that goes far beyond the recognition of a prior conviction.' " (*Id.* at p. 134.) The court may rely on facts that "the jury was necessarily required to find to render a guilty verdict, or that the defendant admitted as the factual basis for a guilty plea." (*Id.* at p. 136.) The sentencing court cannot make a " 'disputed determination about "what the

defendant and state judge must have understood as the factual basis of the prior plea." ' " (*Id*. at pp. 133–134.)

### C. Analysis

Defendant argues that New Mexico's burglary statutes are broader than California's residential burglary statute, in that New Mexico's statutes criminalize felonies that would not be felonies if committed in California. As examples, defendant compares New Mexico's false imprisonment statute (N.M. Stat. Ann., § 30-4-3) that does not require "violence, menace, fraud, or deceit" as is required under section 237, subd. (a).)

Even assuming New Mexico's burglary statute is broader than California's, the trial court did not err in finding that defendant's New Mexico conviction qualifies as a serious felony in California because the record of defendant's conviction demonstrates that he was convicted of burglary with the intent to commit sexual penetration, and sexual penetration (§§ 261, 287, 289) is a felony under California law. (See *Gallardo*, *supra*, 4 Cal.5th at p. 135.)

Although defendant pleaded no contest to burglary as charged in the indictment, and the indictment alleged that defendant entered the property with the intent to commit sexual penetration, he argues the trial court could not find that he pleaded to burglary with the intent to commit sexual penetration. First, defendant appears to argue that the record of conviction does not specify the felony offense that was the target of the burglary. We cannot agree. The indictment charged defendant with "**Aggravated Burglary (Commits Battery)**" and alleged that defendant "did enter the dwelling house … with intent to commit criminal sexual penetration when he got inside, and touched or applied force to [Victim 2] in a rude or angry manner while entering, leaving, or while inside." When defendant agreed to plead no contest, he agreed to plead no contest to residential burglary "as charged as an included offense in Count 1 of the … Indictment."

33.

New Mexico Statutes Annotated (1978) section 30-16-3, subdivision (A) defines "burglary" as "without authorization, enter[ing] a dwelling house with intent to commit any felony or theft therein." Burglary is aggravated if the person is armed with a deadly weapon either before or after entering, or if the person commits a battery on any person during the burglary. (N.M. Stat. Ann., § 30-16-4.) Both burglary and aggravated burglary require that defendant intended to commit a felony inside the dwelling.

Second, defendant argues that "the indictment was amended by the terms of the plea to generically charge a lesser included offense[,] so the language of the original count was irrelevant." We cannot agree with this characterization. The agreement provided "[t]hat this agreement, unless rejected or withdrawn, serves to amend the complaint, indictment, or information to charge the offense to which defendant pleads, without the filing of any additional pleadings." The agreement's provision that it amends the indictment "to charge the offense to which defendant pleads," only affected the allegation that elevated the offense to aggravated burglary (that defendant committed a battery inside the residence) because it was not part of the charge to which defendant agreed to plead guilty. However, the intent to commit sexual penetration was a necessary element of an element of both the burglary to which defendant pleaded guilty and the aggravated burglary that was originally charged.

Furthermore, we cannot agree that the prosecution's decision to permit defendant to plead no contest to residential burglary somehow amended the indictment's allegation that defendant intended to commit the felony of sexual penetration. Under New Mexico case law, the intent with which a defendant enters the dwelling is an element of burglary. (*State v. Elliott* (N.M.Ct.App. 1975) 88 N.M. 187, 195 [539 P.2d 207, 215] [" 'specific intent to commit a felony … is an essential element of the state's case to be proved beyond a reasonable doubt' "], overruled on other grounds *State v. Elliot* (N.M.Ct.App. 1976) 89 N.M. 305 [551 P.2d 1352].) Additionally, the intent to a commit

34.

the specific felony charged must be proven. For example, in *State v. Elliot*, Elliot was charged with entering a dwelling with the intent to commit rape therein. (*Ibid*.) "When we speak of specific intent to commit rape, we mean specific intent to have sexual intercourse, without the female's consent, which intent exists at the time that the defendant enters the home." (*Ibid*.) The New Mexico Court of Appeals overturned defendant's burglary conviction because the record contained evidence that the victim consented to intercourse. (*Id*. at p. 196.) Therefore, residential and aggravated burglary both require that the prosecution prove defendant intended to commit a felony and, as alleged in the indictment, that felony was sexual penetration.

Additionally, our review of the uniform jury instructions for New Mexico Statutes Annotated sections 30-16-3 and 30-16-4 further supports our conclusion that the intent to commit the specified felony is an element of both crimes. The burglary instruction describes the second element as "[t]he defendant entered the … [dwelling] [or] [other structure] with the intent to commit [a theft] [or] [_____]4 (*name of felony*) when inside." (N.M.R. Ann. Crim. UJI 14-1630 (2022 ed.) p. 672.)[10] Use Note 4 provides: "If intent to commit a felony is alleged, the essential elements of the felony must be given if not separately instructed. To instruct on the elements of an uncharged offense, UJI 14-140 NMRA must be used." (Use Note 4 to N.M.R. Ann. Crim. UJI 14-1630, p. 673.) The uniform jury instructions for aggravated burglary contain this same element and use note. (See N.M.R. Ann., Crim. UJI 14-1632 & Use Note 2, p. 674.) Because defendant's intent is an element of residential burglary, we cannot find that defendant's agreement to plead to residential burglary amended this element of the original charge or the lesser included offense to which defendant entered his plea.

---

[10]     Citations to Michie's Annotated Local, State & Federal Court Rules Of New Mexico Criminal Uniform Jury Instructions refer to the 2022 edition.

Furthermore, defendant specifically agreed to plead to residential burglary "as charged as an included offense in Count 1" of the indictment, and that included the allegation as to his intent to commit the felony of sexual penetration. Therefore, defendant's New Mexico burglary conviction records established that defendant intended to commit sexual penetration when he entered the dwelling because it was an element of the offense alleged in the indictment and because he agreed to plead to that count of the indictment as charged. The court may rely on facts that "the jury was necessarily required to find to render a guilty verdict, or that the defendant admitted as the factual basis for a guilty plea." (*Gallardo*, *supra*, 4 Cal.5th at p. 136.)

The plea in the New Mexico case thus included the allegation that defendant committed burglary and intended to commit the felony of sexual penetration. Defendant relies upon *People v. Strike* (2020) 45 Cal.App.5th 143 for the proposition that a plea does not admit the facts stated in the charging instruction. (See *id*. at p. 154.) In *Strike*, the defendant pleaded guilty to participating in a criminal street gang (§ 186.22, subd. (a)), which was reflected in his change of plea form. (*Strike*, at p. 153.) However, the fact that he participated in the crime with another gang member was not part of the plea form; rather, it was contained in the charging documents. (*Ibid*.) The change of plea form did not refer to the defendant's plea to the charge "as alleged." (*Ibid*.) Therefore, the *Strike* court held it was improper for the trial court to consider the allegations in the charging document. (*Ibid*.) Here, however, the trial court properly relied upon defendant's intent to commit sexual penetration, as alleged in the indictment, because defendant agreed to plead to the lesser included offense "charged as an included offense in Count 1" of the indictment, and count 1 alleged that defendant intended to commit sexual penetration as an element of the his New Mexico burglary offense. Therefore, defendant agreed as part of his plea that he intended to commit sexual penetration when he entered the victims' residence.

In *Gallardo*, the trial court reviewed the preliminary hearing testimony of the victim of an assault to conclude that the defendant was armed with a knife during the commission of the crime. (*Gallardo*, *supra*, 4 Cal.5th at p. 126.) The fact that the defendant was armed with a knife elevated the assault to a serious felony and a strike that could serve as a prior to enhance the defendant's sentence. (*Ibid*.) Our Supreme Court concluded that it was improper for the trial court to use the victim's testimony at the preliminary hearing in finding that the defendant was armed with a knife while committing the assault when the defendant did not adopt the testimony as a factual basis for her guilty plea. (*Id*. at p. 136.) The trial court was only permitted to consider the plea itself, and the defendant did not specify that she used a knife when entering her guilty plea. (*Ibid*.)

However, *Gallardo* recognized that a trial court could rely upon an indictment or jury instructions because "[a]n indictment or jury instructions might help identify what facts a jury necessarily found in the prior proceeding." (*Gallardo*, *supra*, 4 Cal.5th at p. 137.) Here, defendant's New Mexico conviction records include facts to demonstrate he entered a dwelling with the intent to commit sexual penetration. Defendant pleaded no contest with a specific reference to the allegations of count 1 of the indictment that alleged he intended to commit sexual penetration. The trial court could rely upon the indictment because defendant pleaded no contest to burglary as a lesser included offense to the crime charged in the indictment. The indictment provides the facts necessary to demonstrate that defendant intended to commit sexual penetration when he entered the dwelling.[11]

---

[11]   In New Mexico, "[c]riminal sexual penetration is the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission." (N.M. Stat. Ann., § 30-9-11, subd. (A).) Sexual penetration is punished by varying degrees dependent upon whether the individual is a minor or was committed using force. (*Id*., subds. (C)–(G).) Defendant has not argued that sexual

The burglary to which defendant pleaded no contest in New Mexico involved the intent to commit sexual penetration upon entering the dwelling. The record of conviction establishes that defendant intended to commit sexual penetration when he committed the burglary and is sufficient to satisfy the requirements of burglary in California. Therefore, there is substantial evidence to support the trial court's conclusion that the conviction qualifies as a prior strike (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and as a prior serious felony conviction (§§667, subd. (a)).

## DISPOSITION

Defendant's sentence is vacated, and the matter is remanded to the trial court to exercise its discretion under section 654, as amended by Assembly Bill 518. (Stats. 2021, ch. 441, § 1.) The judgment is otherwise affirmed.

HILL, P. J.

WE CONCUR:

LEVY, J.

POOCHIGIAN, J.

---

penetration under New Mexico law would not be punished as a felony under California law. (See, e.g., §§261, 287, 289.)